**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JANIDET LUJANO,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 07 C 4822 |
| **TOWN OF CICERO, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Janidet Lujano ("Lujano") sued the Town of Cicero ("Cicero," "the Town") and several of its officials -- the Town's President, Larry Dominick ("Dominick"), the Town's Superintendent of Police, Anthony Iniquez ("Iniquez"),[1] the Superintendent of the Town's Auxiliary Police Force, Moises Zayas ("Zayas"), and the Deputy Superintendent of the Town's Auxiliary Police Force, Serge Rocher ("Rocher") -- for violating her constitutional rights under 42 U.S.C. § 1983. Her complaint also asserts claims under Illinois law for intentional infliction of emotional distress ("IIED") and assault and battery. In brief, Lujano claims that for a period of roughly two years, she was sexually harassed by Dominick and Zayas, and that she was demoted in retaliation for refusing their advances. In addition, she alleges that she was also demoted on account of her gender and because of her refusal to engage in

---

[1] Iniquez has since retired.

political activities for Dominick.  Moreover, Lujano claims that she was subjected to even further retaliation after she came forward with these allegations.

Lujano's First Amended Complaint ("the complaint") consists of four counts: Count I, which is asserted against all of the defendants, alleges violation of Lujano's equal protection rights under § 1983; Count II, also asserted against all defendants, alleges violation of Lujano's first amendment rights under § 1983; Count III alleges intentional infliction of emotional distress against Dominick, Rocher, Zayas, and the Town; and Count IV alleges assault and battery against Dominick, Zayas, and the Town.

Iniquez and Rocher have moved for summary judgment with respect to Counts I through III of the complaint; the Town has moved for summary judgment on Counts III and IV.  For the reasons discussed below, both motions are denied.

## I.  Background[2]

Lujano was hired as an officer for the Town of Cicero's

---

[2] The parties have raised various evidentiary objections to certain of each other's claims.  For example, Iniquez and Rocher object to Lujano's reliance on an expert report because, they complain, the "report comes without any supporting affidavit verifying its authenticity."  Iniquez & Rocher Resp. to Pl.'s L.R. 56.1 Stmt. ¶¶ 80-89.  Lujano objects to certain testimony offered by the defendants on the ground that it was elicited by leading questions.  *See* Pl.'s Resp. to Iniquez & Rocher Mot. Summ. J. at 7-8. I do not address the parties' arguments on this point because my decision does not turn on the evidence to which they have objected.

auxiliary police force in June 2005.[3]  She was promoted to the rank

of sergeant later that year, and remained on the force until August

2009, when her employment was terminated.[4]  Lujano alleges that

from 2005 until roughly the end of 2006, Dominick and Zayas

subjected her to sexual harassment.  In particular, she claims that

Dominick and Zayas repeatedly made lewd comments to her about her

breasts and other matters of a sexual nature.  She also alleges

that both Dominick and Zayas touched her inappropriately and made

unwelcome sexual advances towards her.

On January 4, 2007, Lujano left work abruptly after finding

that her menstrual period had unexpectedly begun and had visibly

stained her clothing.  Although she did not inform Rocher, or seek

prior approval from him or any of her other superior officers, she

claims that she put Auxiliary Officer Greg Becerra ("Becerra") in

charge before departing.  While she was away, a car accident

occurred.  The dispatcher attempted to contact Lujano during the

incident but received no response.  When Lujano returned to work on

---

[3] Auxiliary officers are generally permitted to work a maximum of 1560 hours per year (roughly 32 hours per week).  Unlike ordinary police officers, auxiliary officers do not have arrest powers.  Rather, they are employed chiefly for purposes of traffic and crowd control.  Auxiliary sergeants are responsible for supervising auxiliary officers, assigning them their duties, and performing other tasks requested by dispatch.

[4] Lujano was also employed by the Town of Cicero from 1999 to 2004, at which point she claims that she was fired for political reasons.  That period of her employment is not at issue in the current suit.

January 8, 2007, Rocher told her that she had been demoted and was no longer a sergeant.

### A.   Lujano's Demotion

According to Lujano, the January 4, 2007 incident merely served as a pretext for her demotion.  She insists that Rocher had previously told her that it was unnecessary for her to obtain prior approval when she needed to leave work unexpectedly, and that she could simply put Officer Becerra in charge during her absence. Pl.'s L.R. 56.1 Stmt. ¶ 13.  She maintains that this arrangement had been followed on several previous occasions and that it had never caused any problems.  *Id.*  The real reason for her demotion, she claims, was to retaliate against her for rebuffing Dominick's and Zayas's sexual advances.  She also maintains that her demotion was a form of retaliation for her refusal to participate in political activities, such as attending precinct meetings, that Dominick requested after she had been promoted to the rank of sergeant.  Still further, she alleges that she was demoted on account of her gender, and that her position was reduced so that a male officer, Louis Vasquez, could be made a sergeant.

In support of her claim that the January 4, 2007 incident was pretextual, Lujano cites, among other things, a note written by Officer Becerra on January 9, 2007, which largely corroborates her side of the story.  In the note, Becerra states that he "was told

-4-

to take charge" by Lujano after she left as "[he] normally d[id] in her absence." Pl.'s Rule 56.1 Stmt. ¶ 17. Moreover, it is undisputed that when Zayas learned of what Becerra had written, he became upset, yelled at Becerra, and instructed him to rewrite the note to state it was "unknown" whether Becerra had been put in charge after Lujano left work. Pl.'s Rule 56.1 Stmt. ¶ 18.[5]

For their part, the defendants deny that Rocher ever told Lujano that she could leave work without first getting approval from a superior officer. While they nevertheless claim that the rules and regulations clearly require officers to obtain prior approval before leaving their posts, they fail to cite any particular rule or provision in support of their position. The defendants also maintain that Lujano had been warned on several previous occasions about showing up late for work or for not showing at all. Nevertheless, it is undisputed that Lujano's

---

[5]Lujano further claims that she was surreptitiously demoted in December 2006, well before the January 4, 2007 incident took place. I do not find sufficient support for this contention in the record. For example, Lujano cites a portion of Iniquez's deposition testimony in which she claims Iniquez admitted that Lujano was demoted in December 2006. On inspection, however, Iniquez's testimony on this point is tentative and equivocal. He never unambiguously confirms that she was demoted in December 2006, and he appears confused about when the events in question took place. Lujano also attempts to support her claim by showing that her pay was reduced in December 2006. However, the only evidence she cites for this claim is an earlier memo she had written to Iniquez in which she claims that her pay had been reduced in December 2006. On the basis of this evidence, it would not be possible for a reasonable jury to conclude that Lujano was demoted prior to the January 4, 2007 incident.

personnel file contains no evidence of any previous reprimands or warnings.  Iniquez & Rocher Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 15. The defendants also concede that the January 4, 2007 incident was the first in which Lujano had ever abandoned her post.  Iniquez & Rocher Resp. to Pl's L.R. 56.1 Stmt. ¶ 15.

**B.    March Meetings Between Lujano and Iniquez**

On March 1, 2007, about three months after her demotion, Lujano sent a memo to Iniquez in which she alleged for the first time that she had been sexually harassed by Dominick and Zayas.  In the memo, she also stated that she felt she had been demoted for political reasons and because of her gender.  Later in the month, Lujano met with Iniquez to discuss her allegations.  During one such meeting, on March 20, 2007, she claims that Iniquez "started screaming at her and threatened to fire her and stated that he could fire her whenever he wanted, without any explanation." Pl.'s L.R. 56.1 Stmt. ¶ 27.  He also warned Lujano not to try to intimidate him in an attempt to get her sergeant stripes back.  *Id*.

Lujano was ultimately reinstated as a sergeant on March 19, 2007.  She claims, however, that the reinstatement was in name only and that she began to suffer even more severe retaliation in subsequent weeks and months.  Indeed, she contends that the defendants' retaliation continued even after she filed the instant suit in August 2007.  In what follows, I recount some of the main incidents on which Lujano's claims of retaliation are based.

## C.   The September 15, 2007 Reprimand

On September 15, 2007, Lujano was on duty in a squad car with Becerra.  Becerra stopped to speak with a personal acquaintance. Lujano claims that she saw Fran Reitz, Cicero's Town Collector, stationed nearby in her vehicle, watching her and Becerra. According to Lujano, Reitz "passed by them, looked at them and then drove away."  Pl.'s L.R. 56.1 Stmt. ¶ 27.  Later that day, Lujano and Becerra were written up for failing to maintain contact with dispatch.

The parties dispute precisely how long Becerra spent talking with his acquaintance.  They also dispute whether Lujano's and Becerra's conduct indeed constituted a violation of departmental rules and regulation.  The defendants assert that "[t]here is a rule requiring officers to maintain contact with dispatch for officer safety, and had they followed the appropriate procedure, Lujano and Becerra would have been obligated to call dispatch." Iniquez & Rocher Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 47.  Once again, however, they do not cite the specific rule or regulation in question.[6]  Lujano claims that she and Becerra were never really out of contact with dispatch because they remained in their vehicle during the stop and were able to receive any calls that might have

---

[6] Instead of citing the pertinent rule, Iniquez and Rocher claim that Lujano admitted in her deposition testimony that she and Becerra were aware of the rule and that they had violated it.  This characterization of Lujano's testimony is disputed.  *See, e.g.*, Pl.'s Resp. to Iniquez & Rocher 56.1 Stmt. ¶ 43.

been directed to them.

In any event, Lujano claims, it was not unusual for officers to be out of contact with dispatch for limited periods of time. Lujano maintains that the rule was enforced only in her case, and that other officers were simply allowed to disregard it. She claims:

> It was common for officers to be out of contact with dispatch at times, but the rule that Lujano had to radio dispatch, even if still in her vehicle and available, applied only to Lujano. Other officers talked to people on the street and did not call dispatch. The whereabouts of Sgt. Jesus Zayas, Jr. was [sic] frequently unknown; on "many, many" occasions, Lujano observed Sgt. Zayas, Jr.'s car at the Old Country Buffet or at the substation and he had not called himself in.

Lujano L.R. 56.1 Resp. ¶ 40 (citations omitted).

Later that day, Lujano met with Iniquez to discuss the write-up. During the meeting, she complained to him that she felt the reprimand was retaliatory.

**D. Lujano's Meetings with Iniquez on September 20 and 27, 2007**

On September 19, 2007, Lujano experienced what she describes as an anxiety attack while at work: she was taken to a hospital emergency room via ambulance, complaining that her heart was racing and that she was unable to breathe. The next day, Iniquez called Lujano into his office. She again complained to him that she was being subjected to retaliation. In response, she claims that Iniquez "berated" her. Pl.'s L.R. 56.1 Stmt. ¶ 49.

On September 27, 2007, Lujano met again with Iniquez. Iniquez

had arranged for another female officer, Sergeant Lori Lelis, to attend the meeting as a witness. According to both Lujano and Becerra, when Lujano told Iniquez that she wanted Beccera to attend the meeting as her own witness, Iniquez responded by shouting, "You don't need a fucking witness," along with other profanities, and ordered Becerra to leave. Pl.'s L.R. 56.1 Stmt. ¶ 49. Iniquez admits that he ordered Becerra to leave. He claims that he did so, however, because Becerra was a subordinate officer and Iniquez felt that it would have been inappropriate to discuss Lujano's allegations in front of him. Iniquez denies swearing at Lujano. Iniquez & Rocher Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 49.

Later that day, Rocher reprimanded Lujano for having taken a sick day on September 23, 2007 without providing him with a doctor's note. Lujano maintains that her absence was excused, and that other officers were not required to submit doctors' notes when taking days off due to illness. Pl.'s L.R. 56.1 Stmt. ¶ 50. It is undisputed that Iniquez later determined that Lujano had not committed an infraction and rescinded Rocher's write-up.

### E. October 9, 2007: Rocher Disciplines Lujano for Being Off-Post and Out of Uniform.

On October 9, 2007, Lujano and Becerra were working at Sportsman's Park Racetrack. According to Lujano, they had been assigned to posts at opposite ends of a vacant building inaccessible to the public. During the shift, she and Becerra left their posts to talk with one another. Rocher later arrived on

the scene and wrote Lujano up for being off-post. He also wrote her up for being out of uniform, on the ground that she was wearing a civilian rain coat over her uniform. According to the defendants, Rocher had been contacted by Fran Reitz and another Town official, who complained that they had seen two auxiliary officers talking on the job, and that one of the officers was out of uniform. Iniquez & Rocher Resp. to Pl.'s L.R. 51.6 Stmt. ¶ 51.

Here, again, Lujano claims that she was unfairly disciplined for conduct frequently engaged in by other officers without any punishment. She alleges that other officers assigned to Sportsman's Park would frequently talk with one another, sometimes sitting in lawn chairs for their entire shifts, without any reprimand. Pl.'s L.R. 56.1 Stmt. ¶ 53. While Rocher testified that other officers were reprimanded for talking during their shifts at Sportsman's Park, Iniquez & Rocher Resp. to Pl.'s L.R. 51.6 Stmt. ¶ 53, Lujano correctly points out that there is no evidence to this effect in either of the other officers' personnel files. Pl.'s Resp. to Iniquez & Rocher L.R. 56.1 Stmt. ¶ 48. She also notes that although both she and Becerra were off-post at the time, she was reprimanded and Becerra was not.

Lujano further denies that she was out of uniform on the date in question. She contends that she was in compliance with the relevant regulations because, while her stripes were covered by her coat, her badge remained visible. Pl.'s Resp. to Iniquez &

Rocher L.R. 56.1 Stmt. ¶ 51.  Moreover, Lujano claims that she "was told that the officers could wear jackets if they were in their personal vehicle and not in a squad car, which was the situation here" and that "[e]very other officer wears sweaters over their uniforms and it was not an issue before she complained. Pl.'s Resp. to Iniquez & Rocher L.R. 56.1 Stmt. ¶ 51.

Indeed, Lujano points out that Rocher himself was not in uniform when he showed up at Sportsman's Park.  Instead, he was wearing a uniform issued to him by Morton College, where Rocher was also employed as an officer.  The defendants themselves admit that it would have been inappropriate for Rocher to try to supervise auxiliary officers while working for Morton College. According to Rocher, however, he was on his lunch break at the time, and as a result, he technically was not working for Morton College when he spoke with Lujano and Becerra.  Iniquez & Rocher Resp. Pl.'s L.R. 56.1 Stmt. ¶ 51.

**F.  October 10, 2007: Lujano is Forbidden from Working with a Partner**

On the following day, October 10, 2007, Zayas told Lujano that she would no longer be allowed to work with a partner and that she would instead be required to ride alone in her patrol vehicle.  Lujano also alleges that later that day, Zayas told her that "the Administration did not want her there," and that "they should just put her on leave until the lawsuit was over rather than give her all of these write ups trying to fire her."  Pl.'s

L.R. 56.1 Stmt. ¶ 56.

The defendants deny that Zayas made the latter comment to Lujano.  Further, they claim that Zayas told *all sergeants* that they would be required to work alone.  Iniquez & Rocher Resp. Pl.'s L.R. 56.1 Stmt. ¶ 55.  While there is evidence to suggest that the order was given to all sergeants, the record is unclear about precisely when the order was given.  Lujano claims that although she was prohibited from working with a partner in October 2007, the other sergeants did not receive the order until Zayas circulated a memo on the issue in February 2008.  Pl.'s Resp. Iniquez & Rocher L.R. 56.1 Stmt. ¶ 56.  Moreover, Lujano points out that after she went on maternity leave, sergeants again began to ride with partners, and that when she returned from leave, the prohibition was reinstated once more.  Pl.'s L.R. 56.1 Stmt. ¶ 65. The defendants concede that officers began to ride with one another during Lujano's absence; however, they claim that the practice had not been approved, and that Zayas was forced to reiterate the order after Lujano's return.

The defendants also claim that, notwithstanding Zayas's order, Rocher gave Lujano permission to work with a partner if she ever felt unsafe working alone.  Lujano denies ever having received such a dispensation.  Even if Rocher did tell Lujano that she could work with a partner, it is unclear whether this would have been of any help.  After all, Zayas outranked Rocher, and it

is unclear that Rocher had the authority to give such permission. If Lujano had decided to ride with a partner, therefore, she might have remained subject to discipline from Zayas for disobeying his order. Iniquez & Rocher Resp. Pl.'s L.R. 56.1 Stmt. ¶ 55.

## G. October 23, 2007: Lujano is Sent to a Potentially Dangerous Scene without Backup

On October 23, 2007, Lujano was dispatched to a McDonald's restaurant at which a brawl was expected to erupt among gang members. On her way to the scene, Lujano came upon Zayas, who was directing traffic. He instructed her to proceed to the McDonald's. Lujano claims that she informed the dispatcher that she was alone at the time, and she complains that no backup was sent to assist her. In the end, the fight never occurred. It appears that the only other officer to report to the scene was Zayas, who arrived about fifteen minutes later. Lujano claims that she was sent alone to the potentially violent scene as a form of retaliation.

The evidence surrounding this incident is difficult to assess. Recordings of the radio transmissions during the incident appear to indicate that other patrol cars were asked to respond to the incident. Lujano claims, however, that Zayas was aware that she was the only roving car on duty at the time and that no other units would be able to respond. Pl.'s Resp. to Iniquez & Rocher L.R. 56.1 Stmt. ¶ 60. There is some evidence that other officers were in the vicinity, and that Lujano was able to see them after

she arrived at the McDonald's.  Iniquez & Rocher Resp. Pl.'s L.R.
56.1 Stmt. ¶ 57.  Even if other officers were nearby, however, it
appears that none actually reported to the site (except Zayas,
who, as already noted, arrived only fifteen minutes later).

## H.  January 2008: Lujano is Transferred to the Public Safety Office

In November 2007, Lujano learned that she was pregnant. In
January 2008, she was assigned to the Town's Public Safety Office
("PSO").  While the transfer was ostensibly to allow Lujano to
perform light duty during her pregnancy, she claims that the
assignment amounted to a de facto demotion, giving her no work to
do and stripping her of authority.  She also claims that she was
subjected to still further unwarranted disciplinary measures while
working in the PSO building.  For example, Lujano alleges that her
supervisor at the PSO submitted a complaint to the legal
department claiming that Lujano had been wearing civilian attire
while on duty.  Lujano admits that she began wearing street
clothes when her uniform ceased to fit her due to her pregnancy;
however, she insists that Rocher told her that she was permitted
to wear civilian clothes on the job while she was pregnant.  Pl.'s
L.R. 56.1 Stmt. ¶ 63.  She also points out that other employees
had been allowed to wear civilian clothing during their
pregnancies, and that, in any case, she was given no prior warning
about the matter before it was reported to her superiors.

## I.  Additional Evidence

In addition the chronology outlined above, Lujano cites a variety of other incidents as evidence in support of her claims of retaliation. For example, she points out that Rocher encouraged another officer to file an internal affairs complaint against Lujano. Pl.'s Resp. to Iniquez & Rocher L.R. 56.1 Stmt. ¶ 38. Indeed, Rocher told Lujano that he was contemplating bringing a lawsuit against her himself. Lujano also cites evidence indicating that she was assigned more frequently than other officers to work at undesirable locations (the record indicates that she was assigned to work at Sportsman's Park Racetrack on many more occasions than male officers), and that she was excluded from desirable assignments (such as the Town's bike patrol).

**J.   August 17, 2009: Lujano's Employment is Terminated**

Finally, in August 2009, Lujano was notified that her position had been eliminated and that her employment with the Town had been terminated. She later applied for a new Community Service Officer position, but never received a call back after her interview or any explanation as to why she was not hired.

## II.   Legal Standard

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue for trial exists "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant initially bears the burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quotation marks omitted). Once the movant has met this burden, the non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The facts must be construed in the light most favorable to the non-movant, and all justifiable inferences must be drawn in the non-movant's favor. *Anderson*, 477 U.S. at 255.

### III. Discussion

#### A. Count I: Section 1983 (Equal Protection)

Count I of Lujano's complaint is brought under § 1983. Section 1983 creates a cause of action against "'[e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory[,] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Knight v. Wiseman*, 590 F.3d 458, 462 (7th Cir. 2009) (quoting 42 U.S.C. § 1983). Since the Town does

-16-

not seek summary judgment on Count I, it is necessary to consider only what Lujano must show in order to hold Iniquez and Rocher personally liable under ¶ 1983. An defendant may be held individually liable under § 1983 where the plaintiff can establish that the defendant was (1) personally involved in (2) the deprivation of (3) her constitutional rights. *See, e.g.*, *Oliver v. Hinton*, No. 95 C 4651, 1996 WL 99901, at \*5 (N.D. Ill. Feb. 29, 1996).

In Count I, Lujano alleges that the defendants violated her Fourteenth Amendment right to equal protection by subjecting her to a hostile work environment. Hostile work environment claims asserted under § 1983 "apply the same hostile environment standard that is applied in Title VII cases." *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 567 n.6 (7th Cir. 2000) (quotation marks omitted); *see also Collins v. Norris*, 100 Fed. App'x. 553, 555 (7th Cir. 2004). Accordingly, in order to prevail on Count I, Lujano must show: "(1) that her work environment was both objectively and subjectively offensive; (2) that the harassment was based on her membership in a protected class; [and] (3) that the conduct was either severe or pervasive." *Dear v. Shinseki*, 578 F.3d 605, 611 (7th Cir. 2009).

Iniquez and Rocher argue that they are entitled to summary judgment on Count I because: (1) there is no evidence that they participated in or condoned any of the offending conduct that

Lujano alleges; (2) Lujano has not suffered any adverse employment action as a result of the alleged conduct; and (3) the record contains no evidence that they harbored any animosity towards Lujano. These arguments are not persuasive.

First, Iniquez and Rocher argue that they are entitled to summary judgment on Count I because "there is no evidence that they caused, participated or condoned any of the deprivations Lujano claims she was subjected to from 2005 until the end of 2006." Iniquez & Rocher Mot. Summ. J. at 6. This argument mistakenly assumes that the only "deprivations" at issue in Count I are the those occurring prior to 2007 -- i.e., the acts of sexual harassment allegedly committed by Dominick and Zayas. In point of fact, however, Lujano's hostile work environment claim is also based on Iniquez's and Rocher's conduct after that time. It is true that Lujano does not allege that either Iniquez or Rocher engaged in any sexually offensive conduct towards her; but hostile work environment claims need not be based on harassment of a specifically sexual character. As one court has explained:

> Defendants have mistakenly equated [plaintiff's] Title VII gender-based hostile work environment claim with a hostile work environment claim based on conduct of a sexual nature. [Plaintiff] claims that the gender discrimination at the Burbank police department created a hostile work environment for women. Gender-based hostile work environment claims need not involve conduct of a sexual nature to be actionable. Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." A work environment is

> hostile "when discriminatory intimidation, ridicule, and insult . . . is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ."

*Nebel v. City of Burbank*, No. 01 C 6403, 2003 WL 1606087, at *3 (N.D. Ill. Mar. 27, 2003) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)).

Lujano has cited evidence indicating that both Iniquez and Rocher contributed to the hostile work environment she alleges. As recounted above, for example, she has adduced evidence that Iniquez screamed at her on more than one occasion, and that he was involved in her demotion. Similarly, Lujano points to evidence that Rocher consistently went out of his way to discipline her for infractions that were ignored in the case of other officers, and that he admonished her in an intimidating fashion after she initially filed her lawsuit. When the gravamen of Lujano's hostile work environment claim is properly understood, there can be no question that she has come forward with evidence indicating that Iniquez and Rocher contributed to the hostile environment she alleges and that they therefore participated in and/or condoned the deprivation of her equal protection rights.[7]

Iniquez and Rocher also argue that Lujano has offered no

_____

[7] It is worth emphasizing that Iniquez and Rocher do not contend that their alleged conduct is not severe enough to constitute a hostile work environment under § 1983. Rather, their claim is merely that they are not alleged to have perpetrated or participated in the offending conduct.

evidence to show that she suffered any adverse employment action for purposes of her equal protection claim. As an initial matter, they fail to cite any authority indicating that such a requirement applies to hostile work environment claims arising under § 1983. *Cf. Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004) ("[A] § 1983 case does not require an adverse employment action within the meaning of the antidiscrimination statutes, such as Title VII of the Civil Rights Act of 1964.")(citations, quotation marks, and brackets omitted), *abrogated on other grounds by Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009). Even if she were required to show that she suffered an adverse employment action, Lujano has cited sufficient evidence to survive summary judgment on this point. Importantly, an "adverse employment action" is "not limited solely to loss or reduction of pay or monetary benefits, but can encompass other forms of adversity." *Stutler v. Illinois Dept. of Corrs.*, 263 F.3d 698, 703 (7th Cir. 2001). As the Seventh Circuit has explained:

> Retaliatory harassment by co-workers or a supervisor can rise to [the level of an adverse employment action] if it is severe enough to cause a significant change in the plaintiff's employment status. For example, in *Knox v. Indiana*, 93 F.3d 1327 (7th Cir. 1996), we upheld a jury verdict in favor of a plaintiff whose co-workers embarked on a campaign of vicious gossip and profanity aimed at making "her life hell" in response to her complaints that a supervisor sexually harassed her. We reasoned that retaliation could come in many forms and there was sufficient evidence to support the jury's verdict that the plaintiff's co-workers engaged in a campaign of retaliatory harassment and the employer failed to correct it.

*Id.* at 703-04 (citations omitted).

Iniquez and Rocher insist that the acts alleged by Lujano cannot constitute adverse employment actions because "[a]ll of the actions taken to write Lujano up for being AWOL, out of uniform, leaving her post, not calling in, etc., were due to her violations of the rules and regulations of the auxiliary police department." Iniquez & Rocher Mot. Summ. J. at 10. But this is not true of all of the injurious conduct that Lujano has alleged (e.g., being berated and screamed at by Iniquez on multiple occasions). More importantly, this argument assumes precisely what is in question -- namely, that the disciplinary measures taken by Iniquez and Rocher were indeed attributable only to Lujano's infractions, and that she was not disciplined for infractions she did not commit and that the rules and regulations were not applied to her in an unfair or discriminatory manner. Based on the evidence recounted above, Lujano has established the existence of a triable issue of fact on these issues.

Iniquez's and Rocher's final argument collapses for essentially the same reason: they claim that Lujano cannot show that they harbored any animosity towards her because they had a legitimate, non-discriminatory motive for all of the actions that Lujano characterizes as retaliatory. As indicated above, this argument simply ignores evidence suggesting that in a least some instances, Lujano was subjected to disciplinary measures despite

the fact that she did not violate any rule or regulation, and despite the fact that other officers were not disciplined for committing the same infractions.

For these reasons, Iniquez's and Rocher's motion for summary judgment on Count I is denied.

## B.  Count II: Section 1983 (First Amendment)

In Count II, Lujano alleges that the defendants violated her first amendment rights by retaliating against her for her political affiliation and for coming forward with her allegations of sexual harassment by Dominick and Zayas.  To begin with, Iniquez and Rocher devote almost no attention to Lujano's claims of political retaliation.  To the extent that the issue is raised at all, Iniquez and Rocher refer to it in passing and fail to develop any actual argument.  Insofar as Count II is based on these claims, therefore, Iniquez and Rocher are not entitled to summary judgment.

Iniquez and Rocher address Lujano's free speech allegations somewhat more squarely.  Here, however, their arguments are mostly restatements of those advanced in seeking summary judgment on Count I.  Thus, for example, Iniquez and Rocher claim that they could not have engaged in retaliation towards Lujano because they were not aware until March 2007 of Lujano's allegations against Zayas and Dominick.  Once again, this argument assumes that the retaliatory conduct alleged by Lujano consists entirely of her

demotion and other conduct that took place prior to the disclosure of her allegations to Iniquez in her March 2007 memo.  Iniquez and Rocher simply ignore all of the evidence of retaliation that took place after that point.

Moreover, Iniquez and Rocher again argue that Lujano's retaliation claim fails because she cannot show that they subjected her to any "adverse employment action." Iniquez & Rocher Mot. Summ. J. at 7.  As before, they fail to establish that Lujano is required to make any such showing.  On the contrary, it is well settled that although a showing of an adverse employment action is necessary for retaliation claims based on Title VII, no such requirement exists for retaliation claims asserted under § 1983. *See, e.g.*, *Berry v. Illinois Dept. of Human Servs.*, No. 00 C 5538, 2003 WL 22462547, at *11 (N.D. Ill. Oct. 29, 2003) ("Although one of the elements of a § 1983 First Amendment retaliation claim is often satisfied by a showing of an 'adverse employment action,' the required element is not that specific . . . . [Instead all] that is required is that there be some form of retaliatory conduct that is sufficiently adverse to deter the exercise of an employee's First Amendment rights.").

Accordingly, I deny Iniquez's and Rocher's motion for summary judgment on Count II.

## C.  Count III: Intentional Infliction of Emotional Distress

Count III seeks to hold Rocher and the Town liable for

intentional infliction of emotional distress ("IIED"). Under
Illinois law, to "state a claim for intentional infliction of
emotional distress, a plaintiff must allege (1) the defendant's
conduct was extreme and outrageous; (2) the defendant either
intended to inflict severe emotional distress or knew that there
was a high probability that his conduct would do so; and (3) the
defendant's conduct actually caused severe emotional distress."
*Cangemi v. Advocate S. Suburban Hosp.*, 845 N.E.2d 792, 813 (Ill.
App. Ct. Dist. 2006) (quotation marks omitted). Rocher and the
Town advance different reasons in support of their respective
motions for summary judgment on Count III: Rocher focuses on the
first of the elements listed above, arguing that the conduct
alleged by Lujano is not "extreme and outrageous"; the Town argues
that Lujano's claim fails because she has not asserted a basis on
which Cicero can be held liable for the acts of its employees. I
address these arguments separately.

  *1. Rocher*

  Rocher claims that he is entitled to summary judgment on
Count III because the conduct alleged by Lujano is not
sufficiently extreme and outrageous to be actionable. I disagree.

  "Whether conduct is extreme and outrageous is evaluated on an
objective standard based on all of the facts and circumstances."
*Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866 (Ill. App.
Ct. 2000). Defendants may not be held liable for "mere insults,

indignities, threats, annoyances, petty oppressions or trivialities," but only for "conduct . . . so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.* (citations and quotation marks omitted). Illinois courts have held that "[t]he distress inflicted must be so severe that no reasonable person could be expected to endure it." *Id.*

Moreover, in assessing whether conduct is extreme and outrageous, the Seventh Circuit has singled out several factors for courts to consider: "(1) the power and influence wielded by the harassing party; (2) the likelihood that the threatened action could be carried out; (3) the legitimate reasons one might have for making the offensive statement; and (4) the defendant's awareness of the plaintiff's susceptibility to emotional stress." *Chen v. Mayflower Transit, Inc.*, No. 99 C 6261, 2002 WL 1632412, at *6 (N.D. Ill. July 22, 2002). The court has also emphasized that these factors must be "considered in light of all of the facts and circumstances in a particular case, and the presence or absence of any of these factors is not necessarily critical to a cause of action for intentional infliction of emotional distress." *Id.*

According to Rocher, the "disciplinary steps [he] initiated [against Lujano] are nothing more than everyday employment decisions involving discipline of subordinate employees." Iniquez

& Rocher Mot. for Summ. J. at 12. He claims that he takes a strictly "by-the-books" approach to enforcement of departmental rules -- pointing out, for example, that "[h]e has written up 20% of the auxiliary police force for tardiness," *id.* at 12 -- and denies that he treated Lujano any differently from any other employee. Against this, Lujano offers the lengthy catalog of offending conduct reviewed above. In particular, she has adduced evidence indicating that Rocher: precipitated Lujano's demotion by falsely characterized her employment record and work performance; improperly cited her for infractions she did not commit; reprimanded her for infractions ignored in the case of other officers; required her to work without a partner; subjected her to surveillance by Fran Reitz; transferred her to a job at the PSO with no responsibility or authority; instigated another employee to file an internal affairs complaint against her; spoke to her in an intimidating manner regarding the filing of her lawsuit; threatened to initiate litigation against her; and prevented her from performing her job by denying her access to the Town Hall. Viewed in the light most favorable to Lujano, a jury could reasonably conclude that this pattern of conduct is extreme and outrageous.

This result is brought into even sharper relief when one takes account of the context in which Rocher's actions are alleged to have occurred. First, it is highly significant that Rocher

exercised authority over Lujano as her supervisor.  As Illinois courts have emphasized, "the degree of power or authority which a defendant has over a plaintiff can impact upon whether that defendant's conduct is outrageous," and "[t]he more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment." *McGrath v. Fahey*, 533 N.E.2d 806 (Ill. 1988).  Consequently, "courts have found extreme and outrageous behavior to exist in the employer/employee context where the employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment."  *Honaker v. Smith*, 256 F.3d 477, 491 (7th Cir. 2001).  The fact that Rocher was Lujano's superior tends to support the conclusion that Rocher's conduct was extreme and outrageous.

Second, it is significant that Lujano was pregnant for part of the period during which the alleged harassment took place.  As noted above, this is another factor that can contribute to a finding that a defendant's conduct was extreme and outrageous. *See, e.g.*, *McGrath*, 533 N.E.2d at 811 ("Also of serious consideration is a defendant's awareness that the plaintiff is peculiarly susceptible to emotional distress, by reason of some

physical or mental condition or peculiarity. Behavior which (though rude, abrasive or extremely inconsiderate) may not otherwise be actionable may be deemed outrageous if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress."). A jury could reasonably infer that Lujano was particularly vulnerable to emotional strain during that period. *See, e.g.*, *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 606 (7th Cir. 2006) (jury was entitled to consider that the defendants knew plaintiff was pregnant during the time in question and thus that she was particularly susceptible to emotional distress); *Patterson v. Xerox Corp.*, 901 F. Supp. 274, 279 (N.D. Ill. 1995). This, too, supports a finding that Rocher's conduct was extreme and outrageous.

Furthermore, it is important to note that even if none of Rocher's actions would be actionable when considered individually, his conduct can reach the necessary level of egregiousness when taken as a whole. *See, e.g.*, *Cobige v. City of Chicago*, No. 06 C 3807, 2009 WL 2413798, at *13 (N.D. Ill. Aug. 16, 2009) ("A pattern, course, and accumulation of acts can make an individual's conduct sufficiently extreme to be actionable, whereas one instance of such behavior might not be.") (quotation marks and alteration omitted); *Hobson v. Tishman Speyer Props., L.P.*, No. 07 C 5744, 2008 WL 2625905, at *5 (N.D. Ill. June 27, 2008) (noting that the defendant's behavior was not a one-time occurrence but

instead occurred "on a fairly routine basis").

The case Rocher cites in support of his position, *Harriston v. Chicago Tribune Co.*, 992 F.2d 697 (7th Cir. 1993), is unavailing.  The plaintiff there was an African-American woman who had been employed by the Chicago Tribune for roughly twenty years.  After initial success in the company's advertising department, she was offered a promotion to a managerial position in the employee relations department.  When it later became clear that she was not well suited for the position, she transferred back to the advertising department, and was given a job one grade-level above her previous position.  Her performance following the transfer was poor, however, and her superiors made clear that they were displeased with her sales.  Eventually, her supervisor sent her a memo discussing the problems and asking her to explain how she planned to remedy the situation.  Harriston resigned and filed suit, alleging, *inter alia*, intentional infliction of emotional distress.

In support of her IIED claim, Harriston alleged that she was "subjected to a continuous series of intentionally discriminatory acts, including being precluded from supervising two white employees while she was EEO/Employment Manager, being reprimanded and harassed without cause, and being monitored with a telephone eavesdropping device."  *Id.* at 700.  More specifically, she adduced the following examples:

not being allowed to supervise two white subordinates;
being reprimanded for no reason; being refused
participation in the Tribune's Management Incentive
Fund; being forced out of her management position as
EEO/Employment Manager; being promised a promotion in
advertising she was never given; having a major account
[Montgomery Ward] taken away from her and being given
one of the least lucrative sales territories; being
excluded from office activities; not being advised of
changes in policy and being reprimanded for asking about
such changes; being falsely accused of having poor
sales; being threatened with discipline; having her
telephone calls monitored through the use of an
eavesdropping device; having her private vehicle damaged
and vandalized on several occasions in the Tribune
private parking lot and having Tribune management ignore
her concern for her property and personal safety.

*Id.* at 703. The Seventh Circuit affirmed the dismissal of the
claim, holding that "[t]he Tribune's alleged conduct was not so
severe that a reasonable person could not be expected to endure
it, and it did not go beyond all possible bounds of decency. *Id*.

*Harriston* is plainly distinguishable from the instant case.
For example, unlike Lujano, Harriston was never demoted or
terminated. On the contrary, she was promoted at each stage of
her employment with the Tribune, and she quit before there had
been any mention of her possible termination. Moreover, the
Tribune was much more solicitous of Harriston than Rocher or any
of Lujano's supervisors were of her. The Tribune approached
Harriston on its own initiative to offer her the Employment
Manager position; and when it became evident that the job was not
right for her, the Tribune returned her to the advertising
department with a promotion. By contrast, Lujano's relationship

with the defendants was marked by tension and acrimony.  Not only did the defendants make no effort to successively promote Lujano and assign her better positions, they made every effort to find reasons to justify her demotion.  Finally, to the extent that Harriston's allegations bear some similarity to those made by Lujano here -- for example, both claim to have been improperly reprimanded and falsely criticized -- *Harriston*'s holding cannot be straightforwardly applied here, because the precise character of the discipline is unexplained.  For example, while Harriston claims to have been falsely reprimanded, unlike Lujano, she does not appear to have alleged that she was berated or screamed at by her supervisor.

In short, I conclude that, based on the evidence Lujano has cited, a jury could reasonably conclude that Rocher's conduct was extreme and outrageous.  Accordingly, his motion for summary judgment on Count III is denied.

2.  *The Town*

The Town argues that it is entitled to summary judgment on Count III because Lujano has failed to identify a basis on which it can be held liable for the acts of its employees. Specifically, the Town contends that under the doctrine of *respondeat superior*, an employer cannot be held liable for an employee's actions unless the employee's conduct falls within the scope of his employment.  According to the Town, the acts of

sexual harassment allegedly committed by Dominick and Zayas fall outside the scope of their employment. As a result, the Town maintains that it cannot be held liable for Lujano's IIED claim.

This argument is unconvincing for at least two reasons. First, as Lujano explains in her response brief, she does not seek to hold the Town liable under the doctrine of *respondeat superior*. Instead, she maintains that the Town can be held liable by virtue of the fact that it was aware of the extreme and outrageous conduct of its officials and yet did nothing to stop it. Many courts in this District have held that employer inaction under such circumstances is tantamount to authorization of the employee's conduct and is a legitimate basis for holding the employer responsible. *See, e.g.*, *Thomas v. Habitat Co.*, 213 F. Supp. 2d 887, 892 (N.D. Ill. 2002) (quotation marks omitted) (noting that courts "have recognized that management's knowledge coupled with lack of follow-up action is equivalent to express authorization of injurious conduct"); *see also McPherson v. City of Waukegan*, 379 F.3d 430, 443 (7th Cir. 2004) (quoting *Thomas*); *Quela v. Payco-Gen. Am. Credits, Inc.*, 84 F. Supp. 2d 956, 960 (N.D. Ill. 2000). Based on the evidence Lujano has offered, a jury could reasonably conclude that the Town's management was aware of the offending conduct and did nothing to stop it.

Secondly, even if it were necessary to show that the defendants' extreme and outrageous conduct fell within the scope

of their employment, Lujano has satisfied that requirement.    It
is true that Illinois courts have held as a matter of law that
sexually harassing conduct falls outside the scope of an
employee's employment.  *See, e.g.*, *Deloney v. Bd. of Educ. of
Thornton Tp.*, 666 N.E.2d 792, 797 (Ill. App. Ct. 1996) (collecting
cases).[8]  As already explained, however, it is not necessary to
show that the Town can be held vicariously liable for the sexual
harassment allegedly perpetrated by Dominick and Zayas.  Rather,
her claim can also be premised on Rocher's retaliatory conduct.
Unlike sexually harassing behavior, it is far from clear that
Rocher's conduct exceeded the scope of his employment.

In order to determine whether an employee's conduct falls
within the scope of his employment, Illinois courts have adopted
the formula set forth in the Second Restatement of Agency.  *See,
e.g.*, *Nulle v. Krewer*, 872 N.E.2d 567, 569-70 (Ill. App. Ct.
2007).  According to the Second Restatement of Agency:

> (1) Conduct of a servant is within the scope of
> employment if, but only if:
> (a) it is of the kind he is employed to perform;

---

[8] It is perhaps worth noting that the Seventh Circuit has
expressed some doubt about the continuing vitality of this line of
cases. *See, e.g.*, *McPherson v. City of Waukegan*, 379 F.3d 430, 444
(7th Cir. 2004); *Arias v. Allegretti*, No. 05 C 5940, 2008 WL
191185, at *5 (N.D. Ill. Jan. 22, 2008) ("Illinois is replete with
cases holding that acts of sexual assault and molestation are
outside the scope of authority.  Most of those cases are fairly
old, however, and only one involved a police officer."); *Dorsey v.
Givens*, 209 F. Supp. 2d 850, 853 (N.D. Ill. 2001) ("The approach
by the Illinois Supreme Court . . . conflicts with that of the
Seventh Circuit.").

(b) it occurs substantially within the authorized time
        and space limits;
        (c) it is actuated, at least in part, by a purpose to
        serve the master . . . [.]

*Bagent v. Blessing Care Corp*, 862 N.E.2d 985, 992 (Ill. 2007)

(quoting the Restatement (Second) of Agency § 228 (1958)).   In

addition, Illinois courts have held that whether acts fall within

the scope of an employee's employment is a question of fact.

*Career Concepts, Inc. v. Synergy, Inc.*, 865 N.E.2d 385, 393 (Ill.

App. Ct. 2007); *Santana v. State Bd. of Elections*, 864 N.E.2d 944,

952 (Ill. App. Ct. 2007) ("Generally, the question of whether an

agency relationship exists and the scope of the purported agent's

authority are questions of fact.").   As the Illinois Court of

Appeals has explained:

        Only if no reasonable person could conclude from the
        evidence that an employee was acting within the course
        of employment should a court hold as a matter of law
        that the employee was not so acting.   Whether the
        employee's conduct was so unreasonable as to make his
        act an independent act of his own, rather than a mere
        detour or one incidental to employment, is a question of
        degree which depends upon the facts of the case.   This
        question should be decided by a jury, unless the
        deviation is so great, or the conduct so extreme, as to
        take the servant outside the scope of his employment and
        make his conduct a complete departure from the business
        of the master.

*Davila v. Yellow Cab Co.*, 776 N.E.2d 720, 728 (Ill. App. Ct. 2002)

(quotation marks omitted).

        Applying these factors here, I cannot say as a matter of law

that Rocher's conduct went beyond the boundaries of his

employment.   As noted above, the tortious conduct alleged of

Rocher largely consisted of the unfair disciplinary measures he imposed, or tried to impose, on Lujano. As Deputy Superintendent of the Auxiliary Police Force, supervising and disciplining employees is a central part of Rocher's job. Moreover, Rocher's tortious conduct is alleged to have occurred within authorized times and places. With the possible exception of his visit to Sportsman's Park while wearing his Morton College uniform, Rocher's verbal and written reprimands were issued to Lujano while he was on duty. Nor, finally, is it possible to say that Rocher's actions were not intended in some degree to serve the Town. Accordingly, I deny the Town's motion for summary judgment with respect to Count III.[9]

## D.    Count IV: Assault & Battery

---

[9] The Town mentions in passing that under the Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101 *et. seq.*, employers may be immune from sexual harassment not committed by employees within the scope of their employment. This argument need not be addressed because, as Lujano points out, the Town forfeited it by failing to raise it earlier. *See, e.g., Smith v. Waukegan Park Dist.*, 869 N.E.2d 1093, 1098 (Ill. App. Ct. 2007) (The [Tort Immunity] Act creates an affirmative defense that can be waived, not a bar to a court's jurisdiction. Thus, if a local public entity does not assert that it is immune under section 2-109 of the Act, there is no reason for a court to reach the issue."); *see also Mazin v. Chicago White Sox, Ltd.*, 832 N.E.2d 827, 831 (Ill. App. Ct. 2005). The Town has also waived the argument because it has failed to develop it in its brief. Indeed, it has failed to so much as cite the provision of the Act on which it seeks to rely. *See Fabriko Acq. Corp. v. Prokos*, 536 F.3d 605, 609 (7th Cir.2008)(explaining that it is not the court's job to develop arguments for the parties); *United States v. Alden*, 527 F.3d 653, 664 (7th Cir.2008)(finding inadequately developed arguments without substantive legal authority waived).

Count IV of the First Amended Complaint seeks to hold the Town, Dominick, and Zayas liable for assault and battery. Since Dominick and Zayas are not parties to this motion, it is necessary here to examine only the Town's argument for summary judgment. Unfortunately for the Town, its argument on this point once again mistakenly presupposes that Lujano seeks to base its liability on the doctrine of *respondeat superior*. Hence, the Town goes on to argue that it cannot be held liable for Dominick's and Zayas's conduct -- groping and touching of Lujano -- because these actions were not within the scope of their employment. As already explained, Lujano has eschewed any reliance upon a *respondeat superior* theory. As a result, the Town's argument simply misses the point. In the absence of any other argument from the Town, I deny Cicero's motion for summary judgment on Count IV. *See, e.g.*, *Mobley v. Kelly Kean Nissan, Inc.*, 864 F. Supp. 726, 730 (N.D. Ill. 1993) (denying motion to dismiss assault claims).

## IV. Conclusion

For the reasons discussed above, I deny the Town's and Iniquez's and Rocher's motions for summary judgment.

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

Dated: March 5, 2010.

-36-